1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ELOY JOVEN,                              No.  1:22-cv-00168-ADA-SKO (HC)

12                     Petitioner,            **FINDINGS AND RECOMMENDATION
                                              TO DENY PETITION FOR WRIT OF**
13         v.                                 **HABEAS CORPUS**

14   BRIAN CATES, Warden,                     **[THIRTY DAY OBJECTION DEADLINE]**

15                     Respondent.

16

17         Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

18   to 28 U.S.C. § 2254.  He is represented in this action by Paul Stubb, Jr., Esq.  He is currently in

19   state prison serving a sentence of 110 years-to-life plus twelve years pursuant to a judgment of

20   the Tulare County Superior Court.  The habeas petition presents five claims challenging the

21   conviction. As discussed below, the Court finds the claims to be without merit and recommends

22   the petition be **DENIED.**

23   **I.        PROCEDURAL HISTORY**

24         On August 30, 2018, a Tulare County jury found Petitioner guilty of two counts of sexual

25   intercourse/sodomy with a child under ten (Cal. Penal Code § 288.7(a)), four counts of oral

26   copulation/sexual penetration of a child under ten (Cal. Penal Code §288.7(b)), and four counts

27   lewd and lascivious acts with a child under fourteen (Cal. Penal Code § 288(a)).  (Doc. 12-2 at

28
                                              1

144, 146.[1])  On October 17, 2018, the trial court sentenced Petitioner to a total term of 110 years-to-life plus twelve years in state prison.  (Doc. 12-2 at 144-149.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  On February 11, 2021, the Fifth DCA affirmed the judgment.  People v. Joven, 2021 WL 509847, at *11 (Cal. Ct. App. Feb. 11, 2021), *review denied* (Apr. 21, 2021).  Petitioner then petitioned for review in the California Supreme Court. (Doc. 12-20.)  On April 21, 2021, the California Supreme Court summarily denied the petition. (Doc. 12-21.)

On February 8, 2022, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on May 9, 2022. (Doc. 11.)  On September 9, 2022, Petitioner filed a traverse to Respondent's answer. (Doc. 20.)

## II.    FACTUAL BACKGROUND[2]

### A.    Prosecution Case

#### 1.    Disclosure of Abuse

Petitioner and A.V. met in 2008 and married in 2009. When they met, A.V. had two young sons from her prior marriage: S.B., two years old; and E.B., who was an infant.  A.V. and Petitioner later had two sons together: V.J. and J.J.  Petitioner raised stepsons S.B. and E.B. as his own, although A.V. felt Petitioner was not as close with S.B. once V.J. was born.  By 2015, there was tension in the marriage, but A.V. and Petitioner still lived together with the four boys and A.V. was not contemplating a divorce.[3]

On a Saturday evening in March 2015, A.V. and Petitioner were in the living room watching television.  V.J., five years old, came out of his bedroom where he and S.B., eight years old, were playing and said in a joking voice, "[S.B.] kissed my butt."  It did not occur to A.V. that anything "highly inappropriate" had happened because "boys do[] dumb things," but she questioned the two boys.  S.B. said they were playing a game and V.J. told S.B. to kiss his butt so

---

[1] Unless otherwise noted, references are to ECF pagination.

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts in Joven, 2021 WL 509847, at *1-7.  See Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

[3] A.V. and defendant eventually divorced in 2015, following S.B.'s disclosure of abuse.

S.B. did.  It seemed like a game or a joke to A.V. and it did not enter her mind that S.B. might have kissed his brother's unclothed bottom, so she told V.J. that the behavior was inappropriate and sent him to his room.

A.V. taught S.B. his "private parts" were his and to let her know if anyone ever made him feel uncomfortable, but she did not talk to him about inappropriate touching in detail and he never mentioned anything to her prior to that night.  S.B. told A.V. they were just playing around, but when she said he could not do things like that, he appeared afraid to her.  She told S.B. that what he did was inappropriate and asked him where the behavior came from.  S.B. then "[t]imid[ly]" disclosed that when he, his older cousin, G.A., and his two younger cousins, A.J. and A.A., were playing outside in the sprinklers, G.A. made A.J. "put his privates in [S.B.'s] butt" while A.A. watched.

A.V. did not know what to do or think so she asked S.B. to go to his room and she started to cry.  She testified that Petitioner was there the entire time and heard everything S.B. said, but he did not say anything.  After she broke down crying, Petitioner held her and comforted her.  Once she calmed down, A.V. told Petitioner she needed to talk to S.B. further and went to his room.  Petitioner followed, saying he would work on the television in the room.

S.B. was lying on the bottom bunk bed and A.V. laid down next to him.  She testified she was composed and spoke to him again about inappropriate touching.  She told him that he needed to tell her about anything that made him uncomfortable, no matter who was involved, because she could not protect him otherwise.

S.B. began to speak and said, "well."  Petitioner then abruptly scooped him up and hugged him as if trying to console him.  A.V. testified Petitioner told S.B. it was okay, and she told Petitioner that S.B. was trying to talk to her.  Petitioner again told S.B. it was okay.  A.V. said, "No, he wants to tell me something."  S.B. tried to lift his head from Petitioner's shoulder, and A.V. saw Petitioner lean back slightly, make a small nod side-to-side with his head, and put S.B. back on his shoulder.  A.V. started to get nervous.  She told S.B. to tell her and Petitioner to allow him to speak.  S.B. then lifted his head and said, "Daddy makes me suck his pee-pee sometimes."

A.V. grabbed S.B. from Petitioner and screamed at him "to get the fuck out of [her] son's

3

room." After A.V. screamed at him repeatedly, Petitioner left the room. A.V. put S.B. in her bedroom and told him to keep the door locked no matter what he heard. A.V. then went into the living room and screamed at Petitioner to get out of the house. He wanted to go outside and talk about it over a cigarette, but he finally left after she threatened to call police.

After Petitioner drove off, A.V. went to her room and comforted S.B. They were both crying, and S.B. disclosed more details regarding what Petitioner was doing to him. A.V. then called her brother, M.G., who lived down the street, and he came over. A.V. told M.G. what S.B. disclosed, and M.G. then spoke with S.B. After A.V. put S.B. to bed in her room and went to the living room to talk with M.G., he told her it was best to keep Petitioner away from S.B. and not involve the police.[4]

A.V. testified she did not call the police that night because she was in shock, but she called two days later, on Monday. A.V. and S.B. were interviewed that day by Officer Skamel for the purpose of determining whether a crime had been committed and Petitioner was subsequently arrested at his mother's house. An assigned detective arranged for a forensic interview specialist to conduct a Child Abuse Response Team ("CART") interview with S.B., which occurred the next day.

## 2.    S.B.'s CART Interview

During S.B.'s videotaped CART interview, which was played for the jury, S.B. disclosed engaging in acts of fondling, oral copulation, and sodomy with Petitioner, whom he referred to as dad or daddy during the interview and identified by name. S.B. did not recall when the first incident occurred or what happened, but S.B. thought he was six or seven years old and in kindergarten, first grade or second grade. He said that before Petitioner "started doing that nasty stuff to [him]," Petitioner was nice and they did fun things together.

S.B. described several incidents in more detail, including an incident that occurred when they were watching cartoons together. S.B. said they put their hands in each other's "chone-chones," or underwear, and rubbed each other's "private," which meant penis. He said that

---

[4] M.G.'s statement was admitted for the limited purpose of showing what A.V. did next.

sometimes Petitioner told him to, and sometimes Petitioner grabbed his hand and made him. S.B. recalled another incident when Petitioner texted A.V. from the bathroom and told her to have S.B. to bring him some toilet paper.  When S.B. did, Petitioner grabbed his hand and made him rub Petitioner's private.  He also asked S.B. if he could rub S.B.'s private, and he then did so even though S.B. did not want him to.

S.B. said that Petitioner made him "put [Petitioner's] pee-pee inside [his] mouth" "[a] lot" when there were alone together.  S.B. described "[s]ome kind of white stuff" that would come out of Petitioner's private and into his mouth.  Sometimes it got on the floor, the bedding, or Petitioner's pants or underwear.  S.B. thought it was pee because "[it] tasted really, really gross," and he would spit it out in the sink or toilet.  He said his mother was able to smell the white stuff that came out of Petitioner's private and she would wash bedding the next morning.  He recalled asking her one time why she was washing the bedding when she had just washed it the day before and she said she "smelled something gross on it," which S.B. thought was the white stuff.

S.B. reported that Petitioner would ask him, "Want to suck my private?"  One time, S.B. told Petitioner no but he was too scared to say no the other times.  He told Petitioner that he wanted to obey God and God "doesn't like that stuff," but even though Petitioner said it was the last time, Petitioner kept making S.B. orally copulate him and kept reaching inside S.B.'s pants and underwear.  S.B. said that when he showered, Petitioner would put his clothes in Petitioner's room and when S.B. would go in the room to change, he had to orally copulate Petitioner.  S.B. said that when Petitioner was in the bathroom, he felt like running but Petitioner "would get real angry," although he did not know what Petitioner would have done because he never ran.

S.B. also described an incident in which Petitioner put white medicine from a tube on his private and "pushed it really, really hard" into S.B.'s bottom while S.B. was kneeling on the bathroom cabinetry.  S.B. was unable to control his bowels and defecated on the floor. Afterward, Petitioner cleaned up the floor and told S.B. to "keep it a secret."  S.B. said the incidents of sodomy occurred only in the bathroom and although he could not recall how many times it happened, he thought it was more than 10.  Petitioner would say, "Don't tell anybody. Remember, this is our secret."  S.B. thought the white medicine, which Petitioner used "[a] lot"

when he sodomized S.B., was called "A plus D" and his mother used it for his brother's diaper rash.

S.B. recalled orally copulating Petitioner one time in Petitioner's bedroom, more than one time in S.B.'s bedroom, and "more than a thousand" times in the kitchen. During one incident where S.B. was orally copulating Petitioner, Petitioner made S.B. reach around and touch his butt. S.B. recalled being caught only one time, when his mother walked in on them in the kitchen while he was orally copulating Petitioner.[5] S.B. said his mother asked Petitioner what he was doing and then they went into their bedroom to talk. S.B. could not hear what they were saying but after they came out, no one said anything to him.

The last incident of abuse occurred the night before S.B. told his mother what was happening with Petitioner and, during that incident, he and Petitioner were sucking each other's privates at the same time. He said that only happened on one occasion, and then he "was brave enough" to tell his mother what Petitioner was doing to him. He said he just wanted Petitioner to stop and he told Petitioner he was going to tell his mother. Petitioner shook his head no, but S.B. said he did not care.

S.B. also disclosed one incident of sexual conduct involving his three cousins. He said that they were playing in the sprinklers and got cold. After they left the sprinklers to dry off, his older cousin, G.A., came up with the idea. The three of them stared at G.A., but after he punched them, or threatened to punch them, A.J. agreed to do it. S.B. said that A.J. and G.A. then both put their privates in his bottom. S.B. recalled that Petitioner was already touching him by then, but he could not remember if the acts of oral copulation had begun.

3.    S.B.'s Trial Testimony

Approximately three and one-half years passed between S.B.'s CART interview and the trial. S.B. was 12 years old when he testified and he no longer recalled many of the more specific details he related during his CART interview. S.B. remembered being interviewed by a police officer and another woman, but he did not remember what he told them, although he was truthful

---

[5] A.V. denied walking in on defendant sexually abusing S.B. and said if she had seen that, she "would have killed [defendant]." At trial, S.B. did not recall any specifics regarding the kitchen incident.

at the time and told the interviewer everything he could remember.  S.B. no longer recalled the last time Petitioner abused him and he could not remember when it started or how old he was, but he said the first time was "[a] long time ago."

S.B. was uncomfortable testifying and he tried to forget the abuse, but he said that Petitioner "was using his [front] private[s] against [S.B.]," by which S.B. meant Petitioner's penis.  S.B. testified that Petitioner's penis touched his mouth and his butt, and that Petitioner put his penis in S.B.'s butt, which hurt "very bad."  S.B. thought this occurred five to ten times, and he recalled one incident of sodomy in the bathroom that caused him to defecate on the floor.  S.B. also recalled Petitioner putting medicine on his penis prior to sodomizing S.B.

S.B. testified that Petitioner put his penis in S.B.'s mouth at least five times, but not more often than he sodomized S.B., and he did not recall saying it happened more than a thousand times in his CART interview.  S.B. recalled Petitioner reaching inside his underwear a few times to touch him and Petitioner making him reach inside Petitioner's underwear to touch Petitioner. He also recalled one incident in his parents' bedroom when Petitioner told him to lick Petitioner's penis, one incident when they orally copulated one another in his parents' bedroom, and one incident when Petitioner moved S.B.'s hands to Petitioner's butt while S.B. was orally copulating Petitioner.  S.B. did not recall seeing anything come from Petitioner's penis during the incidents or feeling anything in his mouth, but he recalled a gross taste he thought was pee.  He also did not recall if anything got on the sheets or blanket, did not recall his mother complaining about the smelly sheets, did not recall Petitioner doing anything to him when he brought Petitioner toilet paper, and did not recall what happened the time he took a shower and forgot his clothes.

S.B. no longer recalled much about the incident in the kitchen, although he said he remembered telling the interviewer about it.  He testified his mother walked in on them early in the morning, but although something was not right, he did not recall what Petitioner had done and he denied that Petitioner's penis was in his mouth.  He testified he did not know what his mother saw because she never told him or asked him any questions.  He also did not recall his parents having a conversation afterward while he watched cartoons.

S.B. testified that the night he told his mother, they were in his bedroom with Petitioner.

7

Petitioner held him and shushed him, but he told his mother Petitioner was doing bad things to him. He recalled Petitioner was upset, and his mother yelled and kicked Petitioner out of the house.

### 4.     SART Examination

Based on S.B.'s disclosure of sodomy during the CART interview, Corporal Dominguez referred S.B. for a Sexual Assault Response Team ("SART") examination with a registered nurse. The nurse documented a reported history of fondling and oral copulation, and noted that S.B. had no visible injuries, but his perirectal skin was dry and red.  Based on the presence of dry, red perirectal skin, the nurse found that S.B.'s exam was "indeterminate," meaning she was unable to conclude the "abnormality" was caused by sexual assault; and "consistent with history."  At the conclusion of the exam, the nurse made a finding of "[n]onspecific, may be caused by sexual abuse of other mechanisms," and she explained that of the other three possible options -- "normal . . . , sexual abuse is highly suspected, and definite evidence of sexual abuse" -- she had never selected the latter two.

Corporal Dominguez testified he informed the nurse of the sodomy allegation, but she did not take notes and he was not present when she spoke with A.V.  The nurse explained that her examination was based on the history provided by A.V., who mentioned fondling and oral copulation, but not sodomy.  A.V. was not present during S.B.'s CART interview and although she said S.B. eventually disclosed to her that Petitioner sodomized him, she did not recall when that was and did not think it occurred the night of the initial disclosure.  Regarding lack of visible injury, the nurse explained that children's skin is more resilient, they heal quickly, studies have shown only a low percentage of children show signs of anal or genital trauma from penetration, and the use of a lubricant makes a difference.

### B.     Defense Case

#### 1.     Petitioner's Testimony

Petitioner's testimony was generally consistent with A.V.'s as to tension in their marriage the last year, but he denied he made any distinction between his stepsons and his biological sons in terms of treatment.  He also denied he was controlling or disallowed V.J. and J.J. from visiting

8

A.V.'s grandparents, who lived in the same town.  Petitioner described co-parenting the boys with A.V., and coaching V.J.'s and E.J.'s soccer teams.

Petitioner's testimony was also generally consistent with A.V.'s regarding the night of S.B.'s initial disclosure.  V.J. and S.B. were in V.J.'s bedroom when V.J. ran out and told them S.B. kissed his butt.  Petitioner and A.V. summoned S.B. and talked to the boys about what happened.  Petitioner said he and A.V. were both upset, and she was crying because before they sent S.B. to his bedroom, he told them one of his cousins, G.A., touched him.  Petitioner consoled A.V. and then they both went to S.B.'s bedroom because A.V. wanted to talk to S.B.

A.V. laid down on the bed with S.B., who began to cry.  Petitioner testified S.B. stretched out his hands to Petitioner so Petitioner picked him up to comfort him.  Once Petitioner calmed S.B. down, S.B. turned to A.V. and said, "Dadda is touching me, too."  A.V. grabbed S.B. from Petitioner and told him to get out of the room.  He told A.V. he did not do it, but she told him to get out again and he did.

Petitioner went into the living room, sat on the couch and cried.  When A.V. came out and told him to leave the house, he told her he did not do anything and suggested they go outside to talk.  A.V. did not want to talk, however, and he left.  Petitioner testified that he did not know what to do and he had never been accused of anything like that.  He said he still views S.B. as his son and that S.B.'s accusations broke his heart; and he denied ever engaging in sexual misconduct with S.B. or any other child.

          2.     Expert Witness Testimony

          *a.*     *Dr. Gomez*

Dr. Gomez, a forensic clinical and neuropsychologist whose areas of expertise include assessment of sex offenders, evaluated Petitioner for sexual disorders or sexual deviation, now referred to as paraphilias.  Dr. Gomez addressed pedophilia, a common paraphilic disorder that involves the intense desire to have sex with prepubescent children; and he described some of the traits and behaviors associated with the disorder, including that pedophiles mainly possess child pornography, exhibit a noticeably unusual interest in spending time with children, and usually have more than two or three victims.  Based on his review of relevant reports, interview with

Petitioner and administration of numerous tests, Dr. Gomez concluded that Petitioner is of low-average intelligence, showed no significant impairments, and did not fit the criteria for a sexual disorder, including pedophilia, or for other disorders such as major depressive disorder and antisocial personality disorder.

On cross-examination, Dr. Gomez acknowledged that the rate of pedophilia among offenders is only between one and three percent, and that most child molesters are one-time offenders who victimize someone in the household.

<em>c.     Dr. McAuliff</em>

Dr. McAuliff, a university psychology professor with a law degree and doctorate in legal psychology, researches children and the legal system, and his areas of expertise are children's memory and suggestibility, and forensic interviews.  Dr. McAuliff explained that suggestibility looks at the accuracy of memory and factors that influence both memory and reporting in children; and forensic interviewing focuses on designing interviews to maximize accurate information and minimize inaccurate information obtained from children.  He did not interview Petitioner, but reviewed the police reports and the CART interviews of S.B. and his brothers.

Dr. McAuliff testified that factors influencing memory in children include age, repeated questioning by adult authority figures, and cross-contamination from other sources of information.  With respect to age, research focuses on three separate age groups of zero to five years old, six to 13 years old, and 14 years and older, with the youngest group being the most suggestible and the oldest group being the least suggestible, although "[e]ven adults can be influenced by suggestibility."  With respect to questioning, formal questioning by adult authority figures and repeat questioning are factors that influence children's responses, and cross-contamination occurs when children's memories, which are imperfect processes to begin with, are influenced through use of leading questions, overheard conversations, and exposure to sexualized material or other sexualized behavior.

Dr. McAuliff explained that leading questions and children's natural deference toward adults together create problems in reporting by children.  Recommended protocols include the use of open-ended questions and conducting only one videotaped interview in a child friendly setting.

However, Dr. McAuliff acknowledged that most police officers and forensic interviewers now get the training they need and do a better job, compared with past decades.  Areas of concern for Dr. McAuliff included "uncontrolled questions" prior to law enforcement involvement, and he stated that while a poorly done forensic interview makes a situation worse, a forensic interview done well cannot cure prior contamination that has occurred.

Defense counsel provided Dr. McAuliff with the following hypothetical: "If you have an eight-year-old that is questioned by his mother after a younger brother reported inappropriate sexual behavior, and that 8-year-old initially reported sexual activity with cousins, then upon questioning accuses a father of inappropriate touching, do you have any concerns about that and that protocol?"  Dr. McAuliff responded that the child's age, which places him in the middle group in terms of suggestibility, stood out.  In addition, spontaneous disclosure was absent because the child was responding to questions about potential abuse, and the disclosure of additional information while responding to questions is a source of potential report contamination with respect to the origination of details.

Counsel then asked if it would be of concern that the child in the hypothetical was subsequently questioned by other adults, including police officers, a forensic examiner and an uncle.  Dr. McAuliff responded that repeat questioning is a concern because there is potential for contamination every time someone talks to a child, and children's natural deference to authority is a concern because children do not speak in narratives and must be asked a series of questions.  As well, potential exposure to sexual behavior with cousins and exposure to pornography can influence reports.

On cross-examination, Dr. McAuliff agreed that children are capable of accurate reporting even when some of the influencing factors he discussed are present, and, therefore, each situation must be evaluated in context.  He also agreed that disclosures of abuse may often be delayed and may be inconsistent, and that it is common for children not to report every detail during the initial disclosure.  He conceded that the CART interviews of S.B. and his brothers were predominantly based on open-ended questions and followed best practices for forensic interviews.  However, he opined that S.B.'s initial disclosure of abuse was not spontaneous or voluntary because S.B. was

questioned three times that evening: the first time regarding the incident with his brother, which resulted in no disclosure; a second time, which resulted in the disclosure regarding his cousins; and a third time, which resulted in the disclosure against Petitioner. Dr. McAuliffe explained that while the questioning was understandable from a parenting perspective and did not mean S.B. could not produce accurate information, the fact that an adult was asking questions that produced the responses meant cross-contamination existed and created "the chance of inaccuracy."

### 3.   Other Evidence

G.A. did not testify, but his siblings, A.A. and A.J., did. They recalled playing in the sprinklers at S.B.'s house, but A.J. denied he ever sodomized S.B., and A.A. denied ever seeing anything inappropriate. Both testified they would have remembered had anything like that happened. They also admitted they loved Petitioner and G.A., and did not want them to get into trouble.

Petitioner's friend, D.S.; cousin, C.G.; and sister, B.J., who is the mother of G.A., A.J. and A.A., testified as character witnesses. They stated that Petitioner is truthful and honest. D.S. said Petitioner was respectful and mannerly around children, and S.G. and B.J. said they had no hesitation allowing Petitioner around children.

M.G., who is A.V.'s brother and the father of two of B.J.'s five children, also testified. M.G. said S.B. calmly disclosed the inappropriate touching, and A.V. asked him whether she should call the police, which he viewed as "[e]xtremely" odd. He denied he told A.V. not to call police and said it seemed "pretty reasonable" to do so.

## III.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. §

1  2254(a); 28 U.S.C.§ 2241(d).

2       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

3  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

4  enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

5  filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

6  and is therefore governed by its provisions.

7       B.     Legal Standard of Review

8       A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

9  the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

10  that was contrary to, or involved an unreasonable application of, clearly established Federal law,

11  as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

12  based on an unreasonable determination of the facts in light of the evidence presented in the State

13  court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

14  Williams, 529 U.S. at 412-413.

15       A state court decision is "contrary to" clearly established federal law "if it applies a rule

16  that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

17  of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

18  different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

19  406).

20       In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

21  an "unreasonable application" of federal law is an objective test that turns on "whether it is

22  possible that fairminded jurists could disagree" that the state court decision meets the standards

23  set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

24  application of federal law is different from an incorrect application of federal law.'"  Cullen v.

25  Pinholster, 563 U.S. 170, 203 (2011).  The petitioner "must show far more than that the state

26  court's decision was 'merely wrong' or 'even clear error.'"  Shinn v. Kayer, ___ U.S. ___, ___ ,

27  141 S.Ct. 517, 523, 2020 WL 7327827, *3 (2020) (quoting Virginia v. LeBlanc, 582 U. S. ___,

28  ___, 137 S.Ct. 1726, 1728 (2017) (per curiam)).  Rather, a state prisoner seeking a writ of habeas

corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility of fairminded disagreement*."  Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 141 S.Ct. at 523, 2020 WL 7327827, *3.  Congress "meant" this standard to be "difficult to meet."  Richter, 562 U.S. at 102.

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.      Review of Petition

Petitioner raises the following claims for relief: 1) Petitioner's right to a defense and his due process rights were violated when the trial court excluded as double hearsay his immediate denial of the accusations; 2) Multiple instructional errors resulted in violation of Petitioner's due

14

process rights; and 3) The cumulative effect of the errors denied Petitioner his due process rights.

### 1.    Exclusion of Evidence

Petitioner first claims the trial court erred by excluding his immediate denial of the accusations as double hearsay.  He contends the exclusion of this evidence violated his due process rights and his right to present a defense.  The claim was raised on direct review in the state courts.  In the last reasoned decision, the Fifth DCA denied the claim as follows:

**I. Exclusion of A.V.'s Statement to Officer Skamel**

**A. Background**

Officer Skamel met with S.B. and A.V. on March 23, 2015, two days after S.B.'s initial disclosure. A.V. told Skamel that S.B. stated, "'Daddy is making me suck his pee pee and his [*sic*] is sucking mine too,'" and defendant responded, "'I did not do anything.'" Skamel documented A.V.'s statement in her report.

S.B. was the prosecution's first witness and, during cross-examination, defense counsel began to ask him about defendant's denial of the crime. The prosecutor objected and the trial court sustained her hearsay objection. Defense counsel subsequently asked S.B., "But before your dad went in the hallway, he said he hadn't done anything wrong, had he? Didn't he?" S.B. responded that he could not hear.

The next day, defense counsel raised the issue of defendant's denial to A.V. outside the presence of the jury and argued, "[W]e don't want the jury to be left with the impression that there is no response, almost an adopted admission by failing to object, saying he didn't do anything. I think that's why the statement is admissible. [¶] It's spontaneous. It's in response to an accusation, and I think the failure to allow it in is very dangerous because it almost allows for an argument by the prosecutor or reasoning by the juror that that's an adopted admission because he didn't deny it. It's a simple, 'I didn't do anything.' That's all it was."

The prosecutor responded that she was not making any argument that there was an adoptive admission, and the trial court stated its prior ruling would stand.

A.V. testified next and the prosecutor asked her what defendant said after S.B. disclosed the abuse. A.V. stated she did not recall him saying anything. The prosecutor asked if it would "be fair to say that he never said, 'I did it.'" A.V. responded, "He never once denied what my son said." The prosecutor asked if A.V. recalled telling Officer Skamel that defendant told her he did not do it. A.V. did not recall, but agreed that if she did, it would have been true. The prosecutor then clarified with A.V. that defendant never admitted to S.B.'s allegation, which A.V. confirmed.

On cross-examination, defense counsel asked A.V. if defendant said anything in response to S.B.'s disclosure and she said no. Counsel subsequently asked if she recalled defendant saying, "'I didn't do anything,'" and if she recalled telling Officer Skamel he made that statement; A.V. replied no to both questions. She agreed that if she told Skamel defendant denied doing anything, that "would have been a better recollection."

15

During Officer Skamel's subsequent cross-examination, defense counsel attempted to question her about defendant's statement as related by A.V. and the trial court sustained the prosecutor's objection on hearsay grounds.

Defense counsel later raised the issue outside the presence of the jury and argued that the court precluded him from questioning Officer Skamel about A.V.'s prior inconsistent statement. He also argued that pursuant to the motion for reconsideration he filed, defendant's statement was admissible as an adoptive admission or a spontaneous statement, and A.V.'s statement to Officer Skamel was admissible as a prior inconsistent statement. The court reiterated that it had sustained the prosecutor's objection to double hearsay and reaffirmed the ruling.

On appeal, defendant pursues his argument that A.V.'s statement was admissible as a prior inconsistent statement and defendant's denial was admissible as an adoptive admission. [Fn.7] The People concede that some of A.V.'s statements were inconsistent. However, they contend that because defendant failed to point out which specific statements were inconsistent, he did not place the trial court and the prosecutor on fair notice of the basis for his objection, thereby forfeiting review of the claim. Forfeiture aside, the People contend defendant's statement of denial does not qualify as an adoptive admission as it was neither an admission nor offered against defendant.

> [Fn.7] Under the hearsay exception for spontaneous statements, "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) "'The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is ... the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant.... [U]ltimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter.'" (*People v. Brown* (2003) 31 Cal.4th 518, 541; accord, *People v. Blacksher* (2011) 52 Cal.4th 769, 817–818.) Defendant does not pursue his argument that his denial to A.V. was a spontaneous statement, and we find no fault with the trial court's rejection of that argument given the nature and context of the statement at issue.

For the reasons set forth below, we reject the People's forfeiture argument and conclude that A.V.'s statement to Officer Skamel was admissible as a prior inconsistent statement. However, we agree with the People that defendant's denial of the crime does not qualify as an adoptive admission. Further, even if we assume error, the exclusion of this evidence was harmless.

**B. Legal Standard**

"Hearsay is an out-of-court statement that is offered for the truth of the matter asserted, and is generally inadmissible." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108, citing Evid. Code, § 1200; accord, *People v. Sanchez* (2016) 63 Cal.4th 665, 674.) "[M]ultiple hearsay is admissible for its truth only if each hearsay layer separately meets the requirements of a hearsay exception." (*People*

16

*v. Arias* (1996) 13 Cal.4th 92, 149, citing Evid. Code, §§ 1200, 1201; accord, *People v. Anderson* (2018) 5 Cal.5th 372, 403.)

The applicable standard of review is well established. "[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception (*People v. Martinez* (2000) 22 Cal.4th 106, 120) and '[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto ....' (Evid. Code § 402, subd. (c).) We review the trial court's conclusions regarding foundational facts for substantial evidence. (*People v. Phillips* (2000) 22 Cal.4th 226, 236.) We review the trial court's ultimate ruling for an abuse of discretion (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007–1008; *People v. Martinez, supra,* at p. 120), reversing only if ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' (*People v. Brown*[, *supra,*] 31 Cal.4th [at p. ]534.)" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132; accord, *People v. Caro* (2019) 7 Cal.5th 463, 503; *People v. Jackson* (2016) 1 Cal.5th 269, 320–321.)

### C. Analysis

#### 1. Claims of Error

##### a. A.V.'s Prior Inconsistent Statement

###### 1) Forfeiture

We turn first to A.V.'s statement to Officer Skamel. Evidence Code section 1235 provides that "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his [or her] testimony at the hearing and is offered in compliance with [Evidence Code] Section 770." [Fn.8] The People characterize defendant's argument in the trial court as asserting "only that [A.V.] made an *implicitly* inconsistent statement [when] she claimed not to remember saying that [he] said he did not do anything[,]" while he now argues that she "made a *directly* inconsistent statement when she testified, 'He never once denied what my son said.' " (Italics added.)

> [Fn.8] Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:
> "(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or
> "(b) The witness has not been excused from giving further testimony in the action."

Although the People do not expand on the issue, the general rule they rely on for forfeiture is as follows. "Normally, a reviewing court may not consider a claim that the trial court erroneously excluded evidence unless '[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means ....' (Evid. Code, § 354, subd. (a).) However, the rule does not apply when '[t]he evidence was sought by questions asked during cross-examination or recross-examination.' (*Id.*, subd. (c).) 'Normally, if the trial court excludes evidence on cross-examination, no offer of proof is necessary to preserve the issue for consideration on appeal.' (*People v. Foss* (2007) 155 Cal.App.4th 113, 127.) This exception applies only to questions within the scope of the direct examination. 'If the evidence the defendant seeks to

17

elicit on cross-examination is not within the scope of the direct examination, an offer of proof is required to preserve the issue.' (*Ibid.*)" (*People v. Hardy* (2018) 5 Cal.5th 56, 103.)

"'The reason for the [general] requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.'" (*People v. Partida* (2005) 37 Cal.4th 428, 434; accord, *People v. Anderson, supra*, 5 Cal.5th at p. 403.) The rules do "'not exalt form over substance,'" however, and "the requirement must be interpreted reasonably, not formalistically." (*People v. Partida, supra*, at p. 434; accord, *People v. Anderson, supra*, at p. 403.)

As previously set forth, defendant's first attempt to introduce evidence regarding A.V.'s prior inconsistent statement came during his cross-examination of A.V., after she stated during her direct examination, "He never once denied what my son said." A.V. responded during cross-examination that she did not recall defendant denying the crime and she did not recall telling Officer Skamel he denied the crime; counsel did not attempt to refresh A.V.'s recollection. Subsequently, during Skamel's cross-examination, counsel attempted to introduce the evidence of A.V.'s prior inconsistent statement and the trial court sustained the prosecutor's objection on double hearsay grounds. Defendant filed a motion for reconsideration and the parties argued the issue outside the presence of the jury, but the court upheld its ruling without elaboration.

Thus, as a threshold matter, defendant's attempts to elicit evidence of A.V.'s prior inconsistent statement occurred during cross-examination. Nevertheless, even if we assume defendant was required to object and make an offer of proof because his question to Officer Skamel fell outside the scope of direct examination, the trial court and the prosecutor were well aware that defendant was attempting to overcome the prosecutor's objection to A.V.'s out-of-court statement on the grounds of a prior inconsistent statement and, as to defendant's denial, either a spontaneous statement or a quasi-adoptive admission. The record is abundantly clear on this point, and the People's assertion that the trial court never had the opportunity to rule on the issue because defendant never raised it rings hollow. Therefore, we reject the People's forfeiture argument.

### 2) Error

On the merits, we conclude that as to A.V.'s prior inconsistent statement, the trial court erred.  A.V.'s statement to Officer Skamel that defendant denied doing anything is unquestionably inconsistent with her trial testimony that defendant "never once denied" S.B.'s accusation against him. Thus, A.V.'s statement to Skamel was admissible as a prior inconsistent statement under Evidence Code section 1235 and the trial court erred in sustaining the prosecutor's objection as to the first layer of hearsay.

### b. Defendant's Denial as Adoptive Admission

### 1) No Error

We find no error with respect to the trial court's ruling as to defendant's statement, however. Each layer of hearsay must be examined separately for admissibility

(*People v. Anderson, supra*, 5 Cal.5th at p. 403; *People v. Arias, supra*, 13 Cal.4th at p. 149), and we disagree with defendant that under the circumstances of this case, his denial was admissible as an adoptive admission.

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) "Under this provision, '[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citations.] 'For the adoptive admission exception to apply, ... a direct accusation in so many words is not essential.' [Citation.] 'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.'" (*People v. Riel* (2000) 22 Cal.4th 1153, 1189; accord, *People v. Jennings* (2010) 50 Cal.4th 616, 661; *People v. McDaniel* (2019) 38 Cal.App.5th 986, 998.)

Defendant cites no authority for the proposition that because A.V. testified that he never denied S.B.'s accusation, he was entitled to introduce his statement of denial as an adoptive admission, or quasi-adoptive admission, under Evidence Code section 1221. It is clear from the record that the prosecutor, who was aware of the statement in Officer Skamel's police report, did not intend to offer evidence of defendant's silence as an adoptive admission and she did not do so; she did not argue the theory and the trial court did not instruct the jury on adoptive admissions. Nevertheless, because A.V. testified that defendant "never once denied" S.B.'s accusation, that evidence found its way before the jury.

The parties thereafter skirted around the issue and while the jury may have concluded that A.V. gave a conflicting statement, the jury remained uninformed that A.V. told Officer Skamel defendant denied abusing S.B. Therefore, we recognize defendant's concern with the state of the evidence on this issue, and we agree A.V.'s testimony that defendant did not *admit* any wrongdoing, elicited by the prosecutor in an attempt to lessen the impact of A.V.'s testimony that defendant did not *deny* any wrongdoing, was not particularly curative.

However, Evidence Code section 1221 is of no assistance to defendant. It has long been recognized that "[i]f the accused responds to the statement with a flat denial, there is no admission and hence nothing that may be received in evidence." (*People v. Simmons* (1946) 28 Cal.2d 699, 712; accord, *People v. McDaniel, supra*, 38 Cal.App.5th at p. 998; *People v. Wilson* (1965) 238 Cal.App.2d 447, 457; see *People v. Whitehorn* (1963) 60 Cal.2d 256, 262 ["[I]f a denial is coupled with other conduct of the accused which is of evidentiary importance, such as where false and evasive replies are made together with a denial, the evidence may be received [citations]."].) Defendant's statement denying the wrongdoing was plainly not an implied or adoptive admission of guilt offered against him. (*People v. Riel, supra*, 22 Cal.4th at p. 1189.) Therefore, the trial court did not abuse its discretion as to the second layer of hearsay when it rejected defendant's adoptive admission argument and excluded his prior denial.

19

### 2) Admissibility for Nonhearsay Purpose

We observe that "'[w]hen evidence that certain words were spoken ... is admitted to prove that the words were uttered and not to prove their truth, the evidence is not hearsay.'" (*People v. Armstrong* (2019) 6 Cal.5th 735, 786; accord, *Hart v. Keenan Properties, Inc.* (2020) 9 Cal.5th 442, 447; *People v. Smith* (2009) 179 Cal.App.4th 986, 1003.) "The distinction turns not on the words themselves, but what they are offered to prove. The concept can prove analytically elusive when[, as here,] the words themselves also make an assertion. [Citation.] If the words are admitted for a nonhearsay purpose the jury is not allowed to consider the truth of any substantive assertion, and is often instructed to that effect." (*Hart v. Keenan Properties, Inc., supra*, at p. 448.)

Thus, defendant's denial of the abuse, related to Officer Skamel by A.V., might have been admissible to impeach A.V. with her prior inconsistent statement to the extent defendant's denial was not offered for the truth of the matter asserted. However, the record leaves no doubt that the parties and the trial court addressed defendant's denial in the context of a hearsay statement; that is, for the truth of the matter asserted. [Fn.9] As defendant did not advance a contrary argument either in the trial court or on appeal, any such claim is forfeited. (*People v. Livaditis* (1992) 2 Cal.4th 759, 778 ["'Under Evidence Code sections 403 and 405, if a hearsay objection is properly made, the burden shifts to the party offering the hearsay to lay a proper foundation for its admissibility under an exception to the hearsay rule.'"]; see *People v. Hovarter, supra*, 44 Cal.4th at p. 1029 [arguments not adequately briefed on appeal may be deemed waived].)

> [Fn.9] During a discussion outside the presence of the jury, defense counsel mentioned the possibility of a stipulation regarding A.V.'s statement in the police report and the prosecutor said she would consider one, but that was the extent of their discussion on the record and the jury was not apprised of A.V.'s statement to Officer Skamel.

### 2. Prejudice

### a. Standard of Review

We also conclude that even if error is assumed, it was harmless. Although defendant urges that the asserted error violated his constitutional rights to present a defense and to a fair trial, "routine application of state evidentiary law does not implicate defendant's constitutional rights" (*People v. Brown, supra*, 31 Cal.4th at p. 545, fn. omitted; accord, *People v. Thompson* (2016) 1 Cal.5th 1043, 1116), unless the error renders the trial fundamentally unfair (*People v. Merriman* (2016) 60 Cal.4th 1, 70; accord, *People v. Partida, supra*, 37 Cal.4th at p. 439). Complete exclusion of defense evidence "theoretically could rise to this level, [but] excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense[,]" and "[i]f the trial court misstepped, '[its] ruling was an error of law merely; there was no refusal to allow [the defendant] to present a defense, but only a rejection of some evidence concerning the defense.'" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103; accord, *People v. Rogers* (2013) 57 Cal.4th 296, 346–347.)

Such is the case here and, as is evident from the discussion that follows, the exclusion did not otherwise render defendant's trial unfair. Therefore, we review defendant's claim of error under the state law standard set forth in *People v.*

*Watson* (1956) 46 Cal.2d 818, 837, which requires a determination "whether there is a 'reasonable probability' that a result more favorable to the defendant would have occurred absent the error." (*People v. Aranda* (2012) 55 Cal.4th 342, 354; accord, *People v. Richardson* (2008) 43 Cal.4th 959, 1001; *People v. Partida, supra*, 37 Cal.4th at p. 439.)

**b. Error Harmless**

The dispute in this case centered on whether or not defendant committed the crimes of which he stood accused rather than on the identity of the perpetrator or any other issue, and, therefore, the primary focus was necessarily the credibility of S.B.'s allegations as the complaining witness. His account was compelling. Although he no longer remembered many of the more specific details by the time of trial, he testified to incidents of sodomy, oral copulation, and touching by defendant. S.B.'s initial disclosure to his mother occurred shortly after the last incident of abuse and A.V. reported the allegations to police two days later. As such, S.B.'s CART interview was contemporaneous to the ongoing abuse, and his allegations during the interview were not only fairly detailed in nature but unquestionably involved sexual knowledge that is unexpected in a child of his age. Specifically, S.B. described oral and anal sex, use of lubricant to facilitate the sodomy, S.B.'s loss of bowel control on one occasion resulting from sodomy, and the sight, taste and smell of ejaculate, topics that S.B. was still uncomfortable describing and, in part, unfamiliar with when he testified at the age of 12. Further, while defendant testified that he and A.V. had some adult pornographic movies in their bedroom and S.B. asked about one of the titles once, there was no evidence that S.B. had been exposed to pornography as an explanation for his knowledge, and defendant testified he placed the movies out of reach after S.B. asked about the title.

Moreover, because defendant testified, he had the opportunity to, and did, directly deny he molested S.B. or ever acted inappropriately toward S.B. He also testified that in response to S.B.'s disclosure that night, he told A.V. he did not do anything, and except for disputing that he sexually abused S.B., defendant's description of the events that night was materially similar to A.V.'s description. Additional evidence that defendant denied molesting S.B. would not have undermined the credibility of S.B.'s statements regarding the abuse, and given A.V.'s unenviable position as the mother of a child who had just disclosed he was being sexually abused by his stepfather, we are skeptical that introduction of her prior inconsistent statement would have had any measurable impact on the jury's evaluation of her credibility. Therefore, we conclude that there is no reasonable probability that the exclusion of A.V.'s statement that defendant denied molesting S.B. affected the verdicts. (*People v. Aranda, supra*, 55 Cal.4th at p. 354; accord, *People v. Partida, supra*, 37 Cal.4th at p. 439; *People v. Richardson, supra*, 43 Cal.4th at p. 1001.)

Defendant relies on the absence of physical evidence inculpating him; the lack of spontaneity with respect to S.B.'s initial disclosure; S.B.'s lack of recall at trial; the imaginative nature of S.B.'s disclosures regarding his cousins and his mother walking into the kitchen while he was orally copulating defendant; Dr. Gomez's testimony that defendant did not meet the criteria for pedophilia; the testimony of defendant's character witnesses; and the jury's conduct during deliberations to support his claim of prejudicial error. These considerations do not persuade us either that the error was of constitutional magnitude or that it was prejudicial under state law, but we address each in turn because the arguments also inform assessment of defendant's claims of instructional error.

As discussed, the main issue was one of witness credibility. A single witness's testimony is sufficient to support a verdict and credibility determinations rest with the trier of fact, but here, S.B.'s initial disclosure to his mother, followed shortly thereafter by his detailed CART interview, amounted to powerful and compelling evidence, particularly given the explicit sexual nature of the disclosures viewed in the context of S.B.'s young age.

The lack of physical evidence in this case is entirely unremarkable. As explained by the registered nurse who conducted S.B.'s SART examination, attempted DNA collection occurs in acute cases, which she defined as those in which the exam occurs within, at most, 48 hours of the assault. S.B.'s case presented as chronic rather than acute, and the nurse's testimony established that it would have been fruitless to attempt DNA collection where the initial report and physical examination occurred days if not weeks after the last incident of molestation and the victim had subsequently urinated, defecated, showered, brushed his teeth and changed his clothes. The absence of scarring or visible injury in a case involving sodomy was also not unusual; the nurse explained that children's skin is resilient, they heal quickly, and studies have shown that genital and anal trauma is visible only in a small percentage of cases involving children.

We also disagree that the circumstances of S.B.'s initial disclosure, CART interview, or trial testimony undermined his credibility. While S.B.'s disclosure was prompted by A.V. speaking to him about inappropriate touching after he was admonished for kissing V.J.'s butt, the disclosure in this context raises no obvious concerns. S.B. was only eight years old when he disclosed the abuse, which had been ongoing for some time, and he was 12 years old at the time of trial. Memories fade, even in adults who are better equipped to understand context and details. Given's S.B.'s age and the traumatic nature of the events, which he testified he tried to forget, S.B.'s loss of the more specific details between his CART interview and trial testimony was not unusual.

As well, we disagree that the evidence suggests S.B. "only imagined" being molested at his older cousin's direction. The older cousin's two siblings testified they loved both their brother and defendant and did not want either to get in trouble, and their denial that they were involved in an incident of sexual misconduct is not surprising. In any event, it was up to the jury to assess the credibility of the witnesses, as stated, and its verdicts reflect that it believed S.B. While we agree with defendant that it appears extremely unlikely that A.V. would have walked into the kitchen, seen S.B. orally copulating defendant, and walked out, we do not agree with defendant that S.B.'s recollection of this unlikely event had any significant impact on his credibility on the facts of this case.

This leaves defendant's character witnesses and the jury's deliberations. Defendant presented testimony by relatives and a friend vouching for his good character, and the jury was tasked with determining how much weight to give that evidence, if any. Child molestation is a notoriously secretive crime (*People v. Falsetta* (1999) 21 Cal.4th 903, 918), and, therefore, it is not surprising that defendant's friend and family members held him in high regard and believed he was trustworthy. They would not have been character witnesses otherwise and on the facts of this case, we are not persuaded that the exclusion of defendant's denial had any measurable impact on the jury's evaluation of his character evidence.

Finally, nothing about the jury's deliberations gives us any pause, either. During the evidentiary phase, the trial court accepted a note from one of the jurors that read as follows: "1. Did [S.B.] have any reoccurring stomach issues? There was no

22

warning signs not even in hindsight? Why wasn't this asked? [¶] 2. Does the defendant have any priors related to this offense? [¶] 3. Why was it said that there was sodomy even by the witness (victim) and the mother and then retracted by [the] nurse per request [of] the mother? (Saying first there was sodomy and then there wasn't?)"

These questions were asked by one juror during the evidentiary phase and, therefore, they are not reflective of any subsequent struggle with the evidence during deliberations. At the time the juror handed the note to the bailiff, the prosecutor had not yet played S.B.'s videotaped CART for the jury. After the note was received, in addition to playing the CART interview, the prosecutor questioned Corporal Dominguez about what he told the nurse regarding the abuse allegations and A.V. was recalled to the stand. She clarified that she may not have known about the sodomy allegations at the time S.B. was examined by the nurse because he shared details with her over a period of time. She also testified that prior to disclosing the abuse, S.B. had a history of stomach issues and migraines, and he would sometimes vomit in the car when it was time to return home after being with his grandparents. [Fn.10] These stomach issues ceased after the disclosure of abuse.

> [Fn.10] We note the trial court expressed discomfort with jurors asking questions because laypeople are often curious about issues that have no legal significance, but courts have the discretion to permit written questions from jurors. (Cal. Rules of Court, rule 2.1033; *People v. Ochoa* (1998) 19 Cal.4th 353, 418.) In this case, the prosecutor had the opportunity to and did clarify several of the issues through Corporal Dominguez's and A.V.'s testimony.

There is nothing in the record that suggests the jury struggled with the evidence during deliberations or in reaching a verdict. The jury requested the 40-minute CART interview video and it returned the verdicts after deliberating a total of three and one-half hours, approximately. Defendant suggests this indicates it was a close case, but we do not agree. Defendant's characterization of the credibility contest as "difficult" is unconvincing, but we note that both cases he cites for this argument involved the erroneous admission of evidence regarding the witnesses' prior arrests or convictions and the reviewing courts concluded the admission was prejudicial on the facts of those cases. (*People v. Anderson* (1978) 20 Cal.3d 647, 650–651; *People v. Allen* (1978) 77 Cal.App.3d 924, 934–935.)

Here there were two starkly contrasting version of events. Defendant either molested S.B. or he did not, and this case did not involve the improper admission of inflammatory evidence that possibly influenced the jury's assessment of defendant's credibility. The jury asked for the CART interview tape, which was the most compelling piece of evidence in terms of the charges and S.B.'s version of events due to its detail, and if the jury believed S.B., as its verdicts reflect, we find nothing remarkable about a three-hour deliberation. [Fn.11]

> [Fn.11] Defendant's reliance on *People v. Markus* for the proposition that the length of the deliberations in this case signaled a jury struggle is misplaced. (*People v. Markus* (1978) 82 Cal.App.3d 477, 482, disapproved on another ground in *People v. Montoya* (1994) 7 Cal.4th 1027, 1039–1040.) The appellate court's finding of prejudicial error was tied to the principle that "[i]t is the intent which exists in the mind of the perpetrator at the moment of entry which defines burglary." (*People v. Markus, supra,* at p. 481.) In that case, the defendant was waiting in the car while his

1
2
3
4
5
6
7
8

companion burglarized a house, his defense was that he was unaware of the burglary until his companion reentered the car with stolen goods, and the jury had the option of either convicting him of burglary as a principal or acquitting him. (*Id.* at p. 480.) Because the jury was instructed on aiding and abetting, asked a question regarding timing and the formation of criminal intent, and received misinstruction on that issue in response, the jury's return of a guilty verdict shortly thereafter was troubling in the court's view and precluded a finding of harmless error. (*Id.* at pp. 480–482.) The circumstances here are not analogous to those in *People v. Markus*.

Accordingly, we reject defendant's claim of prejudice. We reiterate that the trial court did not err in excluding defendant's denial of the abuse as hearsay but even if we assume error for the sake of argument, it was unquestionably harmless.

9

Joven, 2021 WL 509847, at *7-15.

10

a.     Legal Standard and Analysis

11       This claim is not cognizable on federal habeas review because the admissibility of

12   evidence is a matter of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (state

13   evidentiary ruling cannot provide ground for federal habeas relief unless the admission of

14   evidence violated due process).  There is no Supreme Court authority that squarely addresses

15   whether a discretionary decision to exclude evidence violates a defendant's constitutional right to

16   present relevant evidence.  Moses v. Payne, 555 F.3d 742, 758-59 (9th Cir. 2009); see also Brown

17   v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the issuance of Moses and the present, the

18   Supreme Court has not decided any case either 'squarely address[ing]' the discretionary exclusion

19   of evidence and the right to present a complete defense or 'establish[ing] a controlling legal

20   standard' for evaluating such conclusions.  [Petitioner], therefore, cannot – as the petitioner in

21   Moses could not – show that the state appellate court's ruling was either contrary to or an

22   unreasonable application of clearly established Supreme Court precedent.").  For this reason,

23   Petitioner cannot show that the exclusion of his statements of immediate denials violated his

24   constitutional rights, and habeas relief is unauthorized.  Wright v. Van Patten, 552 U.S. 120, 125-

25   26 (2008).

26       Even if the claim were considered, the state court rejection was entirely reasonable.  As

27   noted by the state court, the case turned on the credibility of the victim, and this was not a close

28   case.  The victim's detailed account was compelling and powerful, especially in light of his age.

24

The victim testified to numerous detailed accounts of molestation including highly explicit and graphic instances of sodomy and oral copulation.  Details such as the taste, appearance, and smell of ejaculate, the use of "A plus D" ointment, and defecation following sodomy recounted in childlike fashion showed the victim could not have possibly learned such information from adult videos.  Moreover, contrary to Petitioner's contention in his traverse that he was prevented from presenting evidence of his innocence, Petitioner in fact testified and denied he molested the victim.  He also testified that he immediately denied the accusation.  There is little doubt that admission of one more denial from Petitioner would not have had any effect on the outcome.  Thus, the state court's determination that the error was harmless was not unreasonable.  The claim should be rejected.

### 2.    Instructional Errors

Petitioner next claims that multiple instructional errors resulted in a denial of his due process rights.  He contends the trial court erroneously omitted a key paragraph from CALCRIM No. 200.  He alleges the trial court improperly modified CALCRIM No. 332 such that the jury lost its permissive discretion concerning expert testimony.  He claims the court failed to instruct the jury with CALCRIM No. 371 on how the jury could use evidence of third-party efforts to suppress evidence where there was no evidence that Petitioner knew or approved of such suppression.  These claims were presented on direct review.  The state court denied the claims as follows:

**A. Forfeiture**

Next, defendant advances four claims of instructional error, two based on errors with the reading of instructions and two based on the omission of instructions. Generally, the failure to object in the trial court forfeits a claim on appeal, but there is an exception "if the substantial rights of the defendant were affected thereby." (§ 1259; accord, *People v. Johnson* (2016) 62 Cal.4th 600, 638.) Although defendant did not object or request instruction regarding the issues he now advances on appeal, because he claims that the errors resulted in the violation of his constitutional rights, we elect to exercise our discretion to reach the claims on their merits without deciding whether the forfeiture doctrine applies. (*Id.* at p. 639.)

**B. Standard of Review**

We review allegations of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) "In

criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) "[I]nstructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (*People v. Holt* (1997) 15 Cal.4th 619, 677; accord, *People v. Thomas* (2011) 52 Cal.4th 336, 356.) "If the charge as a whole is ambiguous, the question is whether there is a '"reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.'" (*Middleton v. McNeil* (2004) 541 U.S. 433, 437 (*per curiam*).) Jurors are presumed to have understood and followed the trial court's jury instructions. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

### C. Analysis

#### 1. CALCRIM No. 200: Duties of Judge and Jury

##### a. Background

The trial court instructed the jury on duties of the judge and jury pursuant to CALCRIM No. 200 as follows:

> "I'm now going to instruct you on the law. The law requires that I read these instructions to you verbatim. You'll also have these written instructions if you wish to reread any of these instructions. [¶] You must decide what the facts are. And it's up to all of you and you alone to decide what happened based only on the evidence that was presented in this trial. You must follow the law as I explain it to you, even if you agree with it.

> "If you believe that the attorneys' comments on the law conflicts with my instructions, you must follow my instructions. Pay careful attention to all of these instructions and consider them together. If I repeat any instruction or idea, do not conclude that it is more important than any other instruction or idea just because I repeated it.

> "Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the instructions and definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings.

> "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume that just because I gave a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.

> "Do not use the Internet in any way in connection with this case either on your own or as a group. Do not investigate the facts or law or do any research regarding this case, either on your own or as a group. And do not conduct any tests or experiments."

The written pattern instruction for CALCRIM No. 200, provided to the jury during deliberations, included the following: "Do not let bias, sympathy, prejudice, or

public opinion influence your decision. Bias includes, but is not limited to, bias for or against the witnesses, attorneys, defendant or alleged victim, based on disability, gender, nationality, national origin, race or ethnicity, religion, gender identity, sexual orientation, age, or socioeconomic status."

Defendant acknowledges multiple minor deviations from a verbatim reading of CALCRIM No. 200 occurred, but he claims omission of the portion on bias and sympathy constituted a structural error because it lowered the prosecution's burden of proof. The People contend there was no error because the court's written instruction controlled and, regardless, the asserted error was not structural and did not result in prejudice. We agree with the People.

### b. Harmless Error

Defendant relies on *People v. Murillo* (1996) 47 Cal.App.4th 1104, 1107 (*Murillo*) for the proposition that given the inability to determine whether the jury read the written instructions, we must assume on review that that the jury did not do so. Reliance on the decision in *Murillo* is misplaced. The decision is ultimately unhelpful to defendant because the appellate court concluded the trial court's failure to instruct regarding a witness who is willfully false in a material part of his or her testimony was harmless error. (*Id.* at pp. 1108–1109.) The decision is also distinguishable because the trial court omitted the instruction in its entirety when it orally instructed the jury on the applicable law, leaving only the written instruction on the issue. (*Id.* at pp. 1106–1107.)

Regardless, we are bound by decisions of our high court (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 197–198), and the California Supreme Court has held that "[t]he risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke" (*People v. Mills* (2010) 48 Cal.4th 158, 200 (*Mills*); accord, *People v. Grimes* (2016) 1 Cal.5th 698, 729). "'To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control,'" and "on appeal we give precedence to the written instructions ...." (*Mills, supra*, at p. 201; accord, *People v. Grimes*, *supra*, at p. 729; *People v. Phea* (2018) 29 Cal.App.5th 583, 606, fn. 18.) This has long been the law. (E.g., *People v. Davis* (1995) 10 Cal.4th 463, 542; *People v. McLain* (1988) 46 Cal.3d 97, 111, fn. 2.)

Here, as in *Mills*, the written instructions were provided to the jury and the written version of CALCRIM No. 200 included the portion regarding bias and sympathy. Although the jury was not specifically instructed that the written instructions control, it was directed to the written instructions should it wish to review any. Moreover, the jury was instructed on the prosecutor's burden of proof and on evaluating witness testimony and conflicting evidence. (CALCRIM Nos. 220, 226, 302.) The latter instructions included the admonitions to "judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have," and not to "disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other." In view of these oral instructions and the complete written instructions, there is no reasonable probability the verdict would have been more favorable to defendant had the trial court also orally admonished the jury pursuant to CALCRIM No. 200 not to let bias, sympathy or prejudice influence its decision.

/////
/////
/////

27

### c. Claim of Structural Error

"[A]n instructional error or omission that amounts to the *total* deprivation of a jury trial would be structural error, that is, reversible per se." (*People v. Merritt* (2017) 2 Cal.5th 819, 830.) However, "harmless-error analysis applies to instructional errors so long as the error at issue does not categorically '"vitiat[e] *all* the jury's findings."'" (*Hedgpeth v. Pulido* (2008) 555 U.S. 57, 61 (*per curiam*); accord, *People v. Aledamat* (2019) 8 Cal.5th 1, 13 [harmless error analysis applies to instruction on legally inadequate theory of guilt]; *People v. Merritt, supra*, at p. 831 [harmless error analysis applies to omission of elements of an offense].) As such, we flatly reject defendant's contention that this error, or the other instructional errors discussed next, were structural in nature.

We also disagree with defendant's claim that the asserted error is of federal constitutional magnitude, but even if we applied the federal standard of review articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), "it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt, supra*, 2 Cal.5th at p. 831, citing *Neder v. United States* (1999) 527 U.S. 1, 15–16, 18; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 70). [Fn.12]

> [Fn.12] "[I]n order to conclude that an instructional error '"did not contribute to the verdict"' within the meaning of *Chapman* [citation] we must '"find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record"' [citations]." (*People v. Brooks, supra,* 3 Cal.5th at p. 70.)

### 2. CALCRIM No. 332: Expert Witness Testimony

### a. Background

Next, defendant claims that the trial court erred in its instruction to the jury on expert witness testimony pursuant to CALCRIM No. 332. The court instructed the jury as follows, with the error in italics:

> "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you're not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide.

> "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, the person's training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion.

> "You must decide on whether the information the expert relied upon is true and accurate. You *must* disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

> "An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It's up to you to decide whether an assumed fact has been proved.

28

"If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion." (Italics added.)

CALCRIM No. 332 provides, relevant to defendant's claim, "You *may* disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (Italics added.) Again relying on *Murillo, supra*, 47 Cal.App.4th at page 1107, defendant argues that the trial court erred when it modified the instruction and informed the jury it must disregard the evidence, and that we must assume the jury did not read the written instruction. The People concede the trial court misspoke, but argue the error was harmless. We agree.

### b. Harmless Error

The trial court did not intentionally modify the instruction. Rather, the written instruction provided to the jury was worded correctly and the court merely misspoke when it substituted "must" for "may" during its oral instruction. As previously stated, the written instruction controls (*Mills, supra*, 48 Cal.4th at p. 201), and "misreading instructions is at most harmless error when the written instructions received by the jury are correct" (*People v. Box* (2000) 23 Cal.4th 1153, 1212, disapproved on another ground in *People v. Martinez, supra*, 47 Cal.4th at p. 948, fn. 10).

Furthermore, although generally, the term "may" is permissive and the terms "shall" and "must" mandatory (*People v. Standish* (2006) 38 Cal.4th 858, 869; *Jones v. Catholic Healthcare West* (2007) 147 Cal.App.4th 300, 307), defendant fails to explain how the court misled the jury with respect to the law. His assertion that the miswording precluded the jury from considering his expert witnesses' opinions and lessened the prosecution's burden of proof is unpersuasive.

In evaluating expert witnesses, the jury was expressly instructed to follow the instruction on the believability of witnesses in general, pursuant to which the jury was admonished, "In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or none of any witness's testimony." Plainly, if the jury concluded that an expert's opinion on an issue was unbelievable, unreasonable, or unsupported by evidence, it should not credit that opinion. "'[M]atter relied on [by an expert] must provide a reasonable basis for the particular opinion offered, and ... an expert opinion based on speculation or conjecture is inadmissible.'" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770; accord, *People v. Wright* (2016) 4 Cal.App.5th 537, 545–546.)

Finally, the error complained of was harmless even under the federal standard of review. The crux of Dr. Gomez's testimony was that defendant did not suffer from pedophilia or any other sexual disorder. However, he explained that among sex offenders, the rate of pedophilia is extremely low—between one and three percent—and most child molestation cases involve one-time offenders who victimize someone in their homes.

Dr. McAuliff identified areas of concern and influence with respect to children's memory and suggestibility, and forensic interviews, but he explained that children do not report in narrative form and information must be obtained through questions and answers. Furthermore, he acknowledged that police and forensic interviewers are better trained now; S.B.'s CART interview was based

29

predominantly on open-ended, nonleading questions; and the forensic interviewer followed the best practices he outlined in his testimony.

Viewing the substance of the expert witnesses' testimony in the context of the facts in this case, we are certain use of the term "must" rather than the term "may" in the trial court's oral instruction to the jury was harmless beyond a reasonable doubt.

### 3. CALCRIM No. 359: Corpus Delicti

#### a. Background

S.B. testified that just prior to disclosing the abuse to his mother, defendant said to him, "'Sh-sh.'" A.V. testified that just prior to the disclosure, defendant pulled S.B. into his lap, hugged S.B., told S.B. it was okay, and moved his head slightly from side to side, at which point she became nervous. There was also evidence that defendant told S.B. to keep what they were doing a secret, but defendant's claim on appeal is confined to his statements the night of the disclosure.

The trial court instructed the jury pursuant to CALCRIM No. 358 on evidence of defendant's statement as follows: "You have heard evidence the defendant made an oral or written statement before the trial. You must decide whether the defendant made any such statements in whole or in part. If you decide that the defendant made such statements, consider the statements along with all the other evidence in reaching your verdict. It's up to you to decide how much importance to give to the statement. Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

Defendant claims that the trial court should have also instructed the jury with CALCRIM No. 359, the pattern instruction on corpus delicti. The instruction provides:

> "The defendant may not be convicted of any crime based on (his/her) out-of-court statement[s] alone. You may rely on the defendant's out-of-court statements to convict (him/her) only if you first conclude that other evidence shows that the charged crime [or a lesser included offense] was committed.

> "That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

> "This requirement of other evidence does not apply to proving the identity of the person who committed the crime [and the degree of the crime]. If other evidence shows that the charged crime [or a lesser included offense] was committed, the identity of the person who committed it [and the degree of the crime] may be proved by the defendant's statement[s] alone.

> "You may not convict the defendant unless the People have proved (his/her) guilt beyond a reasonable doubt."

The corpus delicti rule "requires some evidence that a crime occurred, independent of the defendant's own statements." (*People v. Ledesma* (2006) 39 Cal.4th 641, 721, citing *People v. Alvarez* (2002) 27 Cal.4th 1161, 1181; accord, *People v. Dalton* (2019) 7 Cal.5th 166, 218.) "The principal purpose of the corpus delicti rule is to ensure that a defendant is not convicted of a crime that never occurred.

30

[Citations.] That purpose is fulfilled by the admission of evidence sufficient to establish that the crime occurred." (*People v. Ledesma, supra*, at p. 721.)

Defendant did not confess to molesting S.B. or make any admissions, and the prosecution's case was founded on S.B.'s statements regarding the acts of sexual molestation defendant committed against him. There is no danger that in this case the jury convicted defendant because he shushed S.B. or told S.B. it was okay just prior to the disclosure of abuse. Therefore, even if we assume error for the sake of argument, we find no " 'reasonable probability' that a result more favorable to the defendant would have occurred absent the error." (*People v. Aranda, supra*, 55 Cal.4th at p. 354.)

### 4. CALCRIM No. 371: Consciousness of Guilt

#### a. Background

During S.B.'s CART interview, he disclosed that defendant used a "white medicine" in a tube when sodomizing him. S.B. said it was the medicine his mother used for his younger brother's diaper rash and he thought it was A+D. A.V. testified they had A+D diaper rash cream and A+D ointment in the house. The cream was usually kept in the diaper bag and the ointment, which defendant used for his own rashes, was kept in their bathroom. However, the last time she saw the ointment was on March 23, 2015, which was the day defendant's family members came to the house while she was out and removed most of his belongings, prompting her to call police and make a report. Police did not locate any cream or ointment during the subsequent search of the house. When defendant testified, he said his family removed his clothing and other belongings, but denied they took any ointment or lotion.

On appeal, defendant argues that the prosecution "made a very large issue" out of defendant's family removing his belongings and the missing ointment, "the inference being that they sought to suppress what they believed might be harmful evidence against him." Defendant cites *People v. Terry* (1962) 57 Cal.2d 538, 566 for the proposition that "[w]hile evidence of efforts by a defendant himself to prevent a witness from testifying are admissible against him, in order to make evidence of such efforts by another person admissible it must be established that this was done by the authorization of the defendant," and he claims that the trial court erred in failing to instruct the jury sua sponte on consciousness of guilt pursuant to CALCRIM No. 371.

CALCRIM No. 371, the pattern instruction for suppression or fabrication of evidence as consciousness of guilt provides, in relevant part: "If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of (his/her) guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilt by itself."

#### b. Any Error Harmless

" " " "Generally, evidence of the attempt of third persons to suppress testimony is inadmissible against a defendant where the effort did not occur in his presence. [Citation.] However, if the defendant has authorized the attempt of the third person to suppress testimony, evidence of such conduct is admissible against the

defendant.'"'" (*People v. Williams* (1997) 16 Cal.4th 153, 200, quoting *People v. Hannon* (1977) 19 Cal.3d 588, 599, disapproved on another ground in *People v. Martinez, supra*, 22 Cal.4th at pp. 762–763.) "'Whether or not any given set of facts may constitute suppression or attempted suppression of evidence from which a trier of fact can infer a consciousness of guilt on the part of a defendant is a question of law.... [T]here must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference. Furthermore, the determination of whether there is such evidence in the record is a matter which must be resolved *by the trial court* before such an instruction can be given to a jury.'" (*People v. Kerley* (2018) 23 Cal.App.5th 513, 565, quoting *People v. Hannon, supra*, at pp. 597–598; accord, *People v. Ramirez* (2006) 39 Cal.4th 398, 456.) "[T]he evidence need not conclusively establish fabrication by others or defense authorization of the fabrication before the instruction may be given; '"there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference."'" (*People v. Kerley, supra*, at pp. 565–566, quoting *People v. Alexander* (2010) 49 Cal.4th 846, 921; accord, *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.)

Evidence may be relevant to more than one issue and the introduction of evidence regarding the missing ointment was not necessarily intended to show consciousness of guilt through third party suppression of evidence. (*People v. Abel* (2012) 53 Cal.4th 891, 924–925.) Notably, the prosecutor did not argue that defendant's family suppressed evidence, at defendant's behest or otherwise, and did not mention the missing ointment or the removal of defendant's belongings by his family during closing argument. The People also point out that defense counsel may have elected not to request any instruction on the issue to avoid drawing further attention to the evidence. Nevertheless, we agree with defendant that there was more than a mere passing focus on the ointment, its disappearance from the house and defendant's family's conduct. Indeed, over defendant's objection, the prosecutor succeeded in admitting the police report made by A.V. when she found defendant's family in her house "ransack[ing] it."

It was uncontested that defendant kept A+D ointment in the bathroom for use on his own rashes, his family removed most of his personal belongings from the house on March 23, 2015, A.V. last saw the ointment on that day, and police did not locate the ointment during their subsequent search. A reasonable jury could infer that defendant's family took the ointment when it gathered his personal belongings, but there is no evidence to support a reasonable inference that his family took the ointment to suppress evidence, with or without defendant's authorization. That defendant had the "'mere opportunity'" to direct his family is insufficient. (*People v. Williams, supra*, 16 Cal.4th at pp. 200–201, quoting *People v. Terry, supra*, 57 Cal.2d at p. 566.)

Neither party requested instruction on consciousness of guilt shown by suppression of evidence and the trial court did not raise the issue sua sponte. Defendant acknowledges that there is generally no sua sponte duty to give a limiting instruction (*People v. Najera* (2008) 43 Cal.4th 1132, 1139; accord, *People v. Murtishaw* (2011) 51 Cal.4th 574, 590), but points out "a possible exception [may exist] in 'an occasional extraordinary case in which unprotested evidence ... is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose'" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051–1052, quoting *People v. Collie* (1981) 30 Cal.3d 43, 64; accord, *People v. Murtishaw, supra*, at p. 590). He argues that the omission of the instruction here resulted in a miscarriage of justice, affected his substantial rights, and deprived him of due process and a fair trial. (Cal. Const.,

art. VI, § 13; § 1259; *People v. Jones* (2012) 54 Cal.4th 1, 54 [due process implicated when error infects entire trial] ).

Although we are not persuaded that the evidence in question was dominant and "'both highly prejudicial and minimally relevant to any legitimate purpose'" (*People v. Hernandez , supra*, 33 Cal.4th at p. 1052), we need not decide whether any arguable error occurred because even if we assume that the trial court should have instructed the jury pursuant to CALCRIM No. 371, omission of the instruction was harmless under either standard of review. As we have discussed, the critical issue for the jury was the credibility of S.B.'s allegations. The fact that neither A.V. nor the police were able to locate the A+D ointment usually kept in the bathroom had no bearing on S.B.'s credibility given the absence of any dispute that A+D ointment and diaper rash cream were kept in the household. Therefore, we find beyond a "reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt, supra*, 2 Cal.5th at p. 831, citing *Neder v. United States, supra*, 527 U.S. at p. 18.)

*Joven*, 2021 WL 509847, at *15-21.

### a.     Legal Standard

Initially, the Court notes that a claim that a jury instruction violated state law is not cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Id. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (*per curiam*) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v.

1  Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776

2  (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review

3  of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted

4  in "actual prejudice."  Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47

5  (1998).

6  b.      CALCRIM Nos. 200 and 332

7      Petitioner contends that the trial court misspoke certain parts of CALCRIM Nos. 200 and

8  332 when instructing the jury.  However, the written instructions that were provided to the jury

9  were correct.  Petitioner argues that the judge's oral instructions violated his due process rights.

10     Respondent correctly states that there is no controlling Supreme Court precedent

11 governing a claim that a judge misspoke certain parts of jury instructions whereas the written

12 versions given to the jury were legally correct.  That being said, Petitioner cannot show that the

13 state court's denial of the claim was contrary to or an unreasonable application of Supreme Court

14 authority, and the claim fails.

15     In any case, the state court reasonably determined that the errors were harmless.  Under

16 California law, the written instructions control, and "misreading instructions is at most harmless

17 error when the written instructions received by the jury are correct."  People v. Box, 23 Cal.4th

18 1143, 1212 (2000), *disapproved on another ground in* People v. Martinez, 47 Cal.4th 911, 948

19 n.10 (2010).  Moreover, although the trial court failed to include the portion of CALCRIM No.

20 200 involving bias and sympathy, the trial court did properly instruct the jury on the prosecutor's

21 burden of proof and on evaluating witness testimony and conflicting evidence (CALCRIM Nos.

22 200, 226, 302.)  Those instructions included admonitions to set aside any bias or prejudice.

23 Likewise, whereas the trial judge misspoke by modifying language in CALCRIM No. 332 from

24 "may" to "must" with respect to considering opinion evidence that the jury finds unbelievable,

25 unreasonable or unsupported, the written instructions used the correct language.  In addition, the

26 jury was properly instructed on witness credibility, that it must set aside any bias and prejudice,

27 and it may believe all, part or none of any witness' testimony.  The state court reasonably

28 determined that the error was harmless.

34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### c.   CALCRIM No. 359

Petitioner contends that the trial court erred by failing to give the *corpus delicti* instruction.  As noted by Respondent, *corpus delicti* error is a purely state law issue and barred on habeas review.  Ingersoll v. Herman, 225 F.3d 663 (9th Cir. 2000) (citing Estelle, 502 U.S. at 68) (*corpus delicti* error solely a state-law claim); Lopez v. Allison, No. 1:11-CV-01335-LJO-SKO, 2014 WL 3362228, at *7 (E.D. Cal. July 8, 2014) (same, collecting cases).  Even if the claim were considered, it is meritless.  There is no controlling Supreme Court authority which would require the giving of instructions without request.

### d.   CALCRIM No. 371

Petitioner next contends that the trial court erred in failing to *sua sponte* instruct the jury on evidence suppression and consciousness of guilt.  Petitioner alleges that the prosecution made a great deal out of the fact that the A+D ointment could not be located after Petitioner's family members removed his belongings from the house.  He claims the trial court should have instructed the jury that it could use the evidence of the family members' attempt to suppress evidence against Petitioner only if it was shown that Petitioner authorized the attempt.

As noted above, there is no controlling Supreme Court authority requiring a trial court to give defense instructions without request.  It is undisputed that neither party requested the jury be instructed with CALCRIM No. 371.  Therefore, Petitioner cannot show that the state court's determination was contrary to, or an unreasonable application of, Supreme Court authority.

In any case, the state court reasonably found that any error was harmless.  As previously discussed, the critical issue for the jury was the credibility of the victim.  It was undisputed that the A+D ointment was normally kept in the bathroom for Petitioner's use on his own rashes.  The fact it could not be located had no bearing on the victim's credibility.  Moreover, as discussed previously, the evidence against Petitioner was very strong and compelling.  Even had the instruction been given, there was no chance the jury would have rendered a different verdict.  The claim should be denied.

### 3.   Cumulative Error

In his final claim for relief, Petitioner alleges that the cumulative effect of the errors

1   deprived him of due process. Petitioner also raised this claim on direct appeal to the Fifth DCA,

2   which denied the claim in the last reasoned decision as follows:

3       Finally, defendant claims that cumulatively, the errors committed by the trial court
        resulted in prejudice to him. "In examining a claim of cumulative error, the critical
4       question is whether [the] defendant received due process and a fair trial." (*People
        v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068; accord, *People v. Rivas* (2013) 214
5       Cal.App.4th 1410, 1436–1437.)

6       We found no error in the exclusion of defendant's statement denying the abuse but
        even assuming error, we found it harmless. We also found defendant's
7       instructional error claims harmless, assuming error. Consideration of these alleged
        errors cumulatively and under either standard of review does not compel a
8       different result: defendant was not deprived of a fair trial. (*People v. Duong* (2020)
        10 Cal.5th 36, 75; accord, *People v. Sedillo, supra*, 235 Cal.App.4th at p. 1068;
9       *People v. Rivas, supra*, 214 Cal.App.4th at p. 1437.)

10  *Joven*, 2021 WL 509847, at *21.

11                          a.      Legal Standard and Analysis

12          "Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if

13  their cumulative effect prejudiced the defendant." Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir.

14  1996) (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992)); see also Karis v. Calderon,

15  283 F.3d 1117, 1132 (9th Cir. 2002).  However, the Ninth Circuit has also recognized that where

16  there is no single constitutional error, nothing can accumulate to the level of a constitutional

17  violation.  See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).  In this case, no errors occurred,

18  and hence, there can be no cumulative error.  Even if errors occurred, a reasonable factfinder

19  could have found that the cumulative effect of the alleged errors did not prejudice Petitioner.

20  **IV.     RECOMMENDATION**

21          Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be

22  DENIED with prejudice on the merits.

23          This Findings and Recommendation is submitted to the United States District Court Judge

24  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

25  Local Rules of Practice for the United States District Court, Eastern District of California.  Within

26  thirty (30) days after being served with a copy of this Findings and Recommendation, any party

27  may file written objections with the Court and serve a copy on all parties.  Such a document

28  should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

to the Objections shall be served and filed within fourteen (14) court days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **September 28, 2022**                    */s/ Sheila K. Oberto*
                                              UNITED STATES MAGISTRATE JUDGE